## STOEHR v. MILLER.

(Circuit Court of Appeals, Second Circuit.  December 17, 1923.)

No. 159.

1. **Trusts ⬌25(3)—War ⬌12—Declaration of trust, condition of which did not happen, held nonoperative as to alien enemy beneficiaries.**

Complainant, an American citizen, and his father and brother, German citizens, were owners of a business in Germany and a business in America, and pursuant to a family agreement, made long before America's entrance into the war was expected, whereby complainant was to have the American business and relinquish his interest in the German business, the American business was conveyed to a corporation whose stock was issued to complainant, and he, being unable to convey his German interest on account of the war, executed a declaration of trust of his American interest to protect his father and brother in case anything happened to him before he succeeded in transferring the German interest. Later he succeeded in transferring the German interest. *Held*, that the declaration which complainant retained in his possession never became operative, as the condition upon which it was intended to take effect never happened, and hence complainant's father and brother had no property in this country, within Trading with the Enemy Act, as amended 40 Stat. 459, 1020, and 41 Stat. 35, 977.

2. **Gifts ⬌4—Trusts ⬌1—Methods by which a person may dispose of his property for the benefit of another.**

A person intending to make a voluntary disposition of his property for the benefit of another may do so by a direct conveyance or assignment to donee, by a transfer of the property to a third person upon a trust for donee, or by declaring himself a trustee for donee.

3. **Trusts ⬌22, 39—Delivery of declaration of trust to third person or notice to cestui not essential.**

Where owner of property has declared himself a trustee for another, it is not essential that the declaration of trust should be delivered to a

⬌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

third person or that the cestui que trust should have been informed of the trust.

4. **Trusts ⚍59(1)—Voluntary trust held irrevocable.**

Where a trust is perfectly created, though it is voluntary, it is irrevocable and is not affected by subsequent acts of settlor or trustee.

5. **Trusts ⚍43(3)—Evidence of intent of declarant admissible where declaration retained in his possession.**

Where one signs a written declaration of trust which he retains in his own possession and never discloses to the person designated as cestui que trust or any one for him, while the document prima facie creates a trust, evidence aliunde may be received to determine the intent and effect of the instrument.

6. **Trusts ⚍38—Trustee cannot be compelled to accept office.**

Creator of a trust cannot compel a third person to be a trustee against his consent, but his acceptance of the office is necessary to constitute him trustee and to vest title in him.

7. **Trusts ⚍39—Cestui must accept benefits.**

Property cannot be forced upon a cestui que trust against his will, and a valid trust does not exist if the cestui que trust, when informed of it, clearly and unequivocally rejects or renounces its benefits.

8. **Trusts ⚍39—After renunciation by cestui, settlor holds title clear of trust.**

Any equitable rights arising from a declaration of trust are at an end after renunciation by cestui que trust, and settlor holds the title to the res free and clear of the trust.

9. **Trusts ⚍39—Acceptance or repudiation by cestui relates to date of declaration.**

Acceptance or repudiation of a trust by the cestui que trust when he learns of the trust relates back to the date of the declaration.

10. **War ⚍12—Seizure of property held not to defeat alien enemy's right to renounce trust in his favor.**

Where an American citizen in 1917 made a declaration of trust in favor of alien enemies who did not learn thereof until 1922, *held*, that the seizure of the property did not deprive them of their right to renounce the trust, and it was immaterial that they renounced to defeat the seizure, if such was the fact, as they owed no duty to the United States.

11. **Trusts ⚍91—"Constructive trust" defined.**

"Constructive trusts" are those which arise purely by construction of equity, and wholly independent of any actual or presumed intention of the parties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Constructive Trust.]

12. **Trusts ⚍102(1)—One interested with another in a business prohibited from acquiring rights antagonistic to him.**

Where one is so placed in relation to another that he becomes interested with him in any property or business, he is prohibited from acquiring rights in that property and business antagonistic to the person with whose interest he has become associated, and this doctrine applies not merely to trustees, but to all persons standing in a fiduciary relationship.

13. **Trusts ⚍91—Constructive trust does not arise until cestui elects to assert it.**

A constructive trust cannot arise until the cestui que trustent elects to assert it, and the right to assert it comes to an end when cestui accepts other property in lieu of his claim.

Appeal from the District Court of the United States for the Southern District of New York.

⚍For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in equity by Max W. Stoehr against Thomas W. Miller, as Alien Property Custodian, etc. Decree for defendant, and complainant appeals. Reversed, with directions to grant the requested relief.

This cause comes here on appeal from a decree of the United States District Court for the Southern District of New York.

The complainant is a citizen of the United States and a resident of the state of New York. The amended bill of complaint is filed against Thomas W. Miller, as Alien Property Custodian. The bill is filed under section 9 of the Trading with the Enemy Act. This was the Act of October 6, 1917, 40 St. c. 106, pp. 411, 419. That section defines the method which may be followed by one not an enemy or ally of an enemy who claims property held by the Alien Property Custodian and who seeks to recover possession of it.

The bill states that in 1913 there was organized a copartnership known as Stoehr & Sons. It was composed of Eduard Stoehr, the father, and his three son, Max W., the complainant, Hans E., and Georg. All of these persons, with the exception of the complainant, were at that time and at all times since citizens and residents of Germany. Hans, it is alleged, resided in the United States from 1903 until he died on March 18, 1918, and had taken out in 1913 or 1914 his first naturalization papers. The principal place of business of the partnership was in Passaic, in the state of New Jersey. It continued in business until February 17, 1917, the business managed by the complainant, Max W., and his brother Hans E. The business was a general mercantile and commission business.

In the year 1915, as it is alleged, the complainant entered into an agreement with his father and two brothers that the assets of the business conducted by the partnership of Stoehr & Sons in the United States should be turned over to a corporation, and that the interests in the assets and business of the said partnership belonging to the father and to Georg should be transferred to the complainant, and that in consideration therefor the complainant should transfer to his father and brother all of the stock which he owned in a German corporation called Kammgarnspinnerei Stoehr, his shares in which had a par value of 600,000 marks. The complainant was in addition and as a further consideration to turn over all his interests in other German properties. The brother, Hans, was to retain an interest in the stock of the corporation to be organized which was to be equal to his interests in the partnership of Stoehr & Sons.

It is further alleged that on February 16, 1917, the complainant, with one George G. Roehlig and one Alfred de Liagre, caused to be incorporated under the laws of the state of New York a corporation called Stoehr & Sons, Inc., of which they and the brother Hans were the directors.

But for several years prior to the incorporation of Stoehr & Sons, Inc., in 1917, and for a long time thereafter, so it is alleged, all the certificates for the shares of stock in the German corporation and the other muniments of title of German properties owned by the complainant, and which he had agreed to transfer to his father and his brother Georg in exchange for their interests in the American partnership, were in the possession of certain banks in Germany which were holding them for the complainant.

For many months prior to the incorporation in New York in February, 1917, of Stoehr & Sons, Inc., and for a long time thereafter, because of the war, the blockade communication between the United States and Germany was practically suspended, and there were no means by which the complainant could communicate with his father and his brother Georg or with the banks or make an actual transfer of his interests in Germany to his father and brother in accordance with his agreement with them as already set forth.

It appears that upon the incorporation in New York of Stoehr & Sons, Inc., the complainant and his brother Hans, who held all the stock, executed a voting trust agreement constituting themselves and one Roehlig voting trustees for a period of five years, and in pursuance of the agreement the complainant and the brother Hans deposited their certificates of stock, and voting trust certificates were issued in their stead. There were three of these voting trust certificates issued: One for 1,875 shares to Max W. Stoehr, trustee;

a second for 223.21 shares-also to Max W. Stoehr, trustee; a third for 44.65 shares to Max W. Stoehr. And on the same day that these certificates were issued the complainant, Max W. Stoehr, signed a declaration of trust which stated in substance that he held the 1,875 shares evidenced by certificate No. 1 for the benefit of Eduard Stoehr who was the beneficial owner of the same, and that the shares stood in the name of the complainant as a matter of convenience and that the complainant had no interest in the same except as trustee. On the same day the complainant signed a writing stating that for value received he had bargained, sold, assigned, and transferred to Eduard Stoehr certificate No. 1 for 1,875 shares of stock of Stoehr & Sons, Inc., etc.

On the same day he signed another writing called a declaration of trust stating that he held 223.21 shares of the stock of Stoehr & Sons, Inc., evidenced by certificate No. 3 for the benefit of his brother Georg.

The bill alleges that these instruments were executed by complainant without the knowledge of either Eduard Stoehr or Georg Stoehr, without previous agreement with them, or either of them, and entirely as a voluntary act and with intent to protect the interests of the said Eduard and Georg Stoehr in case the complainant should die before he should be able to carry out his agreement and transfer to his father and brother his German interests as hereinbefore set forth. All of these three instruments were retained in the possession of the complainant, no one of them was ever delivered, and no information as to their existence was ever imparted to either Eduard or Georg Stoehr until January, 1922.

The complainant, pursuant to a demand from the Alien Property Custodian, made certain reports to him and stated in effect that Nos. 1 and 3 of the voting trust certificates were in his name and possession as trustee, but that he had no beneficial interest in them and that they belonged to Eduard and Georg Stoehr, respectively. In making that report he followed the legal advice of his attorney.

In March, 1918, the then Alien Property Custodian took possession of all of the properties of Stoehr & Sons, Inc., forced two of the board of directors to resign, and caused the election of others named by him to succeed the two who had resigned upon his request and to fill the third vacancy created by the death of Hans E. Stoehr, and it is alleged that the Alien Property Custodian has from that time controlled all of the activities of Stoehr & Sons, Inc., and has nominated its directors and officers, and has exercised "complete and supreme control thereover and now exercises such control."

On March 13, 1919, the then Alien Property Custodian made a demand upon the complainant for the delivery to him and notification of the seizure by him of both of the said voting trust certificates issued to complainant, as trustee, and that on March 18, 1919, he took them into his possession and has continued since to hold them in his possession.

It is alleged that on November 3, 1920, the complainant pursuant to his agreement with his father and brother hereinbefore set forth, and in consideration of the transfer to him theretofore made by them of their interests in the assets of the partnership of Stoehr & Sons released and irrevocably empowered the transfer to his father and brothers of all his right, title, and interest in all his German securities and properties.

It is also alleged that in January, 1922 the complainant's father and brother Georg executed and acknowledged separate declarations stating that the shares of stock represented by the trust certificates were not their property and that the shares of stock represented by such certificates did not belong to them but in accordance with prior family arrangements belonged to the complainant. Copies of those declarations were annexed to the bill of complaint, and the declarations were, prior to the filing of the bill, filed with the Alien Property Custodian.

And on February 16, 1922, the complainant pursuant to section 9 of the Act of October 6, 1917, made and filed with the Alien Property Custodian notice of his claim under oath of his title to and ownership of the stock represented by the voting trust certificates of Stoehr & Sons, Inc. He also filed with the Attorney General his application for the allowance of his claim and

the return to him of the aforesaid voting trust certificates. It is alleged that more than 60 days have elapsed since the filing of the claim and the application for its allowance, and that there has been no allowance of the claim and no return of the certificates.

The complainant therefore filed his bill and asked the court to enter a decree adjudging him to be the owner of the certificates and directing the Alien Property Custodian to account for and deliver to him the voting trust certificates and all rights, title, and interest therein and in the stock of the corporation of Stoehr & Sons, Inc., represented thereby.

The court below dismissed the bill, and the case has been brought here upon appeal.

Lee, Smyth, Aron & Wise, of New York City (Harold G. Aron and Nathan A. Smyth, both of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City, and Dean Hill Stanley and Adna R. Johnson, Jr., Sp. Asst. Attys. Gen., for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] The evidence discloses that the complainant came to the United States in 1900, and that he has resided here ever since with the exception that he was absent from the country between 1903 and 1907 which years were spent in Germany, France, South America, and Australia. In May, 1911, he became a citizen of the United States, having previously married an American wife. His father had established in 1879 or 1880 a firm under his own name to engage in the woolen business, and in 1910 or 1911 the firm was changed into an Aktiengesellschaft which answers to our corporation. It was capitalized at 12,000,000 marks, and in 1911 the complainant was the owner, by gifts from his father, of the stock of this company to the value of 600,000 marks; each share having a par value of 1,000 marks. In 1889 the father organized and incorporated in this country the Botany Worsted Mills of Passaic, N. J. The German and the American corporations both prospered, and it appears that before the World War Eduard Stoehr was the highest taxpayer in Leipsig.

Title to some 14,909 shares in the Botany Worsted Mills, of which 36,000 shares were outstanding, was vested in Eduard Stoehr in the Leipsig corporation; he and his sons retaining the ownership of about 6,000 additional shares.

It appears that in 1912 Eduard had fully worked out and announced to his associates in the German corporation a plan which had been adopted as a family understanding for the division of his fortune among his children. His son Georg was to remain in the management of his German corporation, and the management and ownership of his American interests were to be vested in Max, the complainant.

Early in 1915 Georg came to the United States with full oral authority to take steps to have the business of the firm of Stoehr & Sons incorporated and the interests of Eduard and Georg turned over to his son Max, the complainant. And it was the understanding that Max should transfer to Georg his shares of stock in the German corporation. While Georg was in this country, he discussed frequently his father's plan with his brothers Max and Hans who assented to it. But no action was at that time taken to carry it out. All of the shares of stock which Max owned in the German company were bearer shares

and on deposit in German banks. It was agreed that the father's wishes should be carried out and Hans was to exercise the authority vested in him by his father to turn over to Max the American properties whenever Hans and Max considered it advisable. It was at that time anticipated that by May 1916, when the partnership agreement would expire, the transfer could conveniently be made.

Georg returned to Germany in September, 1915, and from the time of his return until after the war no communications of any sort were had between the German and American members of the family. And early in 1917 war between Germany and the United States appeared imminent and Hans and Max thought that they should no longer postpone carrying out their father's wishes. Hans instructed the family lawyer in this country to take the necessary legal steps to incorporate the company.

Action in turning over the property of the partnership to the corporation was taken by Hans, who personally directed the issuance of the stock to Max. The latter then realizing that he held the American shares and also held the title to his German properties which were to be turned over to his brother Georg who was to live in Germany, fully discussed the situation with the family attorney who presented him the declarations of trust which he signed. Max put them in his safe, where they remained until he surrendered them to the Alien Property Custodian, and did not make them known, as already stated, to his father or to Georg until the winter of 1922.

In 1920 Max went to Germany, having been unable in 1919 to get a passport. Prior to leaving for Germany he prepared a power of attorney which, on his arrival in Germany, he delivered to his brother Georg and by which the latter obtained possession of and title to all the stock bank deposits and other properties in Germany which belonged to Max. The declarations were not then mentioned by Max either to his father or to Georg. They never were mentioned by him to them until he arrived in Germany again in December, 1921. At his request they then signed what are referred to as "renunciations." That signed by the father is found in the margin.[1] That signed by Georg is similar.

As a result of the transactions above set forth, the complainant Max, an American citizen, finds himself deprived of all his property. He turned over his German properties to his father and his brother Georg in accordance with the understanding he had with them. And the Alien Property Custodian has seized and taken possession of the voting trust certificates issued to him as trustee under the circumstances al-

---

[1] "The undersigned deposes under oath the following: It became known to me that my son Max Stoehr has signed a deed of trust at the incorporation of the partnership of Stoehr & Sons, in which he declared 1,875 shares, which are standing in his name on the books of the firm, as my property. I herewith declare that I do not consider these 1,875 shares as my property, as they should belong to my son Max in accordance with former arrangements in our family, and that if these shares seized by the Alien Property Custodian, should be returned by him to me, I would feel myself obliged to return them to my son Max as his rightful property.

"Eisenach, January 13, 1922,

"[Signed]                                   Paul Rudolph Eduard Stoehr."

ready set forth, and he also has been ousted from the possession and control of the American business.

As to whether there was an understanding in the family as to what was to be done is shown by the record, as it seems to us, beyond dispute. Max's testimony is as follows:

"Q. Now what was the understanding as the result of these family conferences, as to what was the basis upon which you were to receive the American property? A. I was to relinquish all my holdings in the Kammgarnspinnerei Stoehr & Co., and at the same time it was the understanding that I should rescind my birthright; that means that I should not participate in the inheritance of my father, the estate my father was leaving.

"Q. Were any of these agreements made in writing? A. No, it was not the habit of the Stoehr family amongst ourselves to make agreements in writing."

The testimony of the sister, Else Gutknecht, is as follows:

"To my best knowledge and belief it was arranged in the family that my brother Max in America should be the owner of the company over there, while my brother Georg and I should receive shares of the Kammgarnspinnerei Stoehr & Co., Aktien Gesellschaft, Leipzig-Playwitz."

The testimony of Georg Stoehr, after stating that the understanding was that Max was to have the American properties, was as follows:

"Q. What was Max to do upon receiving that property? A. Max had to waive the German property to ourselves.

"Q. After the partnership was incorporated according to the understanding or the plans referred to in your letter of September 21, 1916, to whom was the stock of the partnership to be issued? A. It was to be issued to Max.

"Q. Were you or your father to have any interest in that stock? A. No.
* * *

"Q. Who were to be the stockholders of the American corporation which was formed in February, 1917? A. The stockholder of the Stoehr & Sons, Inc., was to be my brother Max."

The court below on the opinion, which finally dismissed the bill, concluded as follows:

"There can be no doubt that Eduard and Georg Stoehr even 'imminente bello' had a right to save their property by such an arrangement as they have testified was proposed. Nor can there be any reasonable disposition to view their rights narrowly or technically. The record seems to indicate, however, that they did not make or carry out the plan which they have alleged, but sought to retain the equitable title while placing the legal title in Max Stoehr. This could not be done and the right of the Alien Property Custodian over their property must prevail.

"Accordingly, a decree is granted dismissing the bill with costs."

We have examined this record with care. It satisfies us that prior to the entry of the United States into the war with Germany and as early as 1915 a family understanding existed between Eduard Stoehr and his sons, Georg, Hans, and Max, and that the American properties were to belong to Max, and that the latter's interests in the European properties were to be made over to Eduard and Georg Stoehr. That such an understanding existed is incontrovertibly established. And it existed long before America's entrance into the war was expected.

In an attempt to carry this understanding into effect, the declarations of trust were signed. Neither Eduard nor Georg had any knowledge that such declarations were to be signed or had been signed until some years after the seizure complained of herein. That the legal title to these trust certificates is in Max is not denied. The question is whether the equitable title is in Eduard and Georg. If it is not, then there was no alien interest which the Alien Property Custodian could seize.

The record shows that in executing the declarations of trust Max acted upon the advice of the family attorney, and that he was influenced solely by that fact that he was at that time owning both the German and American stock, although he was under obligations to transfer the German stock to his father and brother in Germany and it was in the hope that if anything happened to him before the transfer could be made his father and brother would be protected.

The testimony of Max as to his signing of the declarations of trust reads as follows:

"Q. Now, then, your act in so doing was then a purely voluntary act on your part? A. It was.

"Q. When and with whom did you first discuss the execution of the declaration of trust; that is, was it before or after the incorporation of the company?

"Mr. Stanley: I object to that question as immaterial and irrelevant.

"The Witness: I discussed it with Mr. Heyn after the incorporation papers of the firm had been filed.

"By Mr. Aron:

"Q. Can you give us the substance of that conversation with Mr. Heyn?

"Mr. Stanley: Same objection, for the same reasons.

"The Witness: Well, the substance was that I called Mr. Heyn's attention to the fact that at the present time I owned both properties.

"By Mr. Aron:

"Q. By both properties what do you mean? A. I mean I owned the American stock, and I still owned the German stock. I wanted to get rid of the German stock in some way, or, if I could not do that, protect my father and brother in case of anything happening to me. I discussed with Mr. Heyn at that time several ways. I suggested a will. Mr. Heyn discarded that right off, and thought the matter over, and then put before me that declaration of trust, which I finally signed.

"Q. Did you have anything to do with the preparation of that instrument?

"Mr. Stanley: The same objection, for the same reasons.

"The Witness: No."

The following is an excerpt from the testimony of Georg Stoehr as to the two declarations of trust:

"A. I never paid any attention to these two documents.

"Q. Had you, prior to 1920 when your brother Max came to Germany, any knowledge of the existence of these papers? A. No.

"Q. Had you ever requested that such a paper be executed? A. No, never.

"Q. Had it been discussed in 1915 when you were in New York City? A. No, not that I know of.

"Q. Had it ever been discussed by you or requested by you? A. No.

"Q. In acting for your father, did he request you or instruct you to get any such instrument? A. No.

"Q. Have you or your father, to your knowledge, ever taken any action with regard to the said instrument? A. No.

"Q. Is it your present understanding that you are entitled to this stock in the New York corporation? A. No, I am not entitled to any stock in the New York corporation.

"Q. Is your father entitled to any stock in this corporation? A. No, we agreed that Stoehr & Sons, Inc., shares were to be issued to Max Stoehr.

"Q. Were they to be issued to him for his own benefit and for the benefit of nobody else? A. Yes."

There was never any understanding between Eduard and Georg on the one side, and Max on the other, that these declarations of trust were to be executed, or that the shares were to be held in trust. These declarations of trust were never delivered, or even the facts of their execution disclosed until January, 1922, and when they were then made known both Eduard and Georg, under oath, declared that they did not consider themselves the owners of the shares and that the shares were the property of the complainant.

That Max in 1920 transferred all his interests in Germany, through a power of attorney, to his brother Georg is also shown:

"Q. And in the power of attorney which you gave your brother Georg in 1920 were those bank deposits included with the shares? A. Yes, everything. The bank deposits at that time were not so large, for in the meantime that new stock issue had been taken up and there were over a million shares there.

"Q. Do you know whether your brother Georg has claimed and taken the bank deposits and the shares? A. Yes, he has."

With this statement as to the facts we are brought to a consideration of the legal questions involved. In considering the legal questions we shall first inquire as to the bearing which Stoehr v. Wallace, 255 U. S. 239, 41 Sup. Ct. 293, 65 L. Ed. 604, has upon the present case. In that case a bill had been filed by the complainant in the present suit suing in his own behalf and as a stockholder in Stoehr & Sons, Inc., and in behalf of all others similarly situated, against the Alien Property Custodian, the corporation and directors of Stoehr & Sons, Inc., and the corporation and directors of Botany Worsted Mills. The bill concerned the 14,900 shares of the capital stock of the Botany Worsted mills which the Alien Property Custodian had seized on March 20, 1918, as enemy owned, and for which he had required the Botany Worsted Mills to issue to him all the shares of stock so seized. The suit was brought to enjoin the Alien Property Custodian from selling the stock which he had thus seized. The court below had refused to issue the injunction and dismissed the bill. The Supreme Court affirmed the case, and in doing so said:

"Of the objections specially directed against the proposed sale, it is enough to observe that as the New York corporation [Stoehr & Sons, Inc.] does not own or have any interest in the shares it is not in a position to criticize or attack the sale; and of course a stockholder [Max] suing in its right is in no better position."

That decision manifestly is not decisive of the question before us in the instant case. The issues involved are not the same. In the instant case the suit is brought for the return to the complainant of shares in the corporation of Stoehr & Sons, Inc., and which had been issued to him outright prior to the declaration of trust, and to which he, an American citizen, held the legal title and claims also the beneficial interest. In the other case at the time of the seizure the legal title to the stock stood in the name of a Leipzig corporation which was an alien enemy, and which was claimed by a New York corporation under

a contract made with the German corporation. There are other particulars which distinguish the two cases, but we need not extend the length of this opinion by what we regard as an unnecessary reference to them.

[2, 3] It is undoubted that a person intending to make a voluntary disposition of property for the benefit of another may accomplish his purpose in either of the following modes: (1) By a direct conveyance or assignment of it to the donee. (2) By a transfer of the property to a third person upon a trust for the donee. (3) By declaring himself a trustee for the donee. 2 Pomeroy's Eq. Jur. § 997; Milroy v. Lord, 4 De G., F. & J. 264. And we do not doubt that where the third mode has been adopted it is not essential that the declaration of trust should be delivered to a third person or that the cestui que trust should have been informed of the trust. See Janes v. Falk, 50 N. J. Eq. 468, 472, 26 Atl. 138, 35 Am. St. Rep. 783. See, however, Govin v. Miranda, 76 Hun. (N. Y.) 414, 27 N. Y. Supp. 1049.

[4] It is also well established that if a trust is one perfectly created, although it is voluntary, it is irrevocable, and is not affected by the subsequent acts of the settlor or the trustee. Bill v. Cureton, 2 Myl. & K. 503; Pycroft v. Christy, 3 Beav. 238; Keyes v. Carleton, 141 Mass. 45, 6 N. E. 242, 55 Am. Rep. 441; Sands v. Old Colony Trust Co., 195 Mass. 575, 577, 81 N. E. 300, 12 Ann. Cas. 837; Thorp v. Lund, 227 Mass. 474, 116 N. E. 946, Ann. Cas. 1918B, 1204; McPherson v. Rollins, 107 N. Y. 316, 14 N. E. 411, 1 Am. St. Rep. 826; Lawrence v. Lawrence, 181 Ill. 248, 54 N. E. 918; Ireland v. Geraghty (C. C.) 15 Fed. 35.

[5] It is our understanding that if one signs a written declaration of trust which he never delivers, but retains in his own possession, and never discloses to the person designated as cestui que trust or to any one for him while the document prima facie creates a trust evidence aliunde may be received to determine the intent and effect of the instrument. In Souverbye v. Arden, 1 Johns. Ch. (N. Y.) 240, 256, Chancellor Kent said in relation to a voluntary settlement that if a grantor retains the deed in his possession the weight of authority is decidedly in favor of its validity "unless there be other circumstances, besides the mere fact of his retaining it to show it was not intended to be absolute."

In the case of a voluntary declaration of trust not delivered or announced, the court may look into the surrounding circumstances and receive evidence bearing upon intent.

In Ambrosius v. Ambrosius, 239 Fed. 474, 152 C. C. A. 352, this court had before it a declaration of trust which read as follows:

"All these foregoing securities belong to my daughter Marie Marjorie Ambrosius, and are held by me in trust for her during my life-time.
"New York, September 26, 1905.        [Signed]  H. Z. Ambrosius."

The court said:

"We have to determine his intention, both from what he wrote in 1905, and what he did during the eight years thereafter. down to the time of his death."

In passing upon that declaration this court said:

"Of course, if Ambrosius intended a present gift to his daughter, it was quite ineffectual for want of delivery, and equity will not intervene to perfect it.

"Therefore the question is: Can the complainant recover upon the strength of a declaration * * * made by the decedent in her favor? What we have to determine is the intention of the decedent. * * * We have to determine his intention, both from what he wrote in 1905, and what he did during the eight years thereafter, down to the time of his death. * * *

"There being no evidence that he ever kept any account with the complainant of the income of the securities, kept them in his own name, used them for his own purposes just as he did all other securities he had, it is impossible to believe that he intended by what he wrote to divest himself of ownership. His conduct during this long period is absolutely inconsistent with the character of a trustee. We cannot believe that he would have acted with such bad faith if he had supposed himself to be a trustee for his daughter in the legal acceptation of that term. We think he intended that only such of the securities as should be in his possession at the time of his death should then go to the complainant."

In that case we held that notwithstanding this writing the declaration did not constitute the signer thereof a trustee in the legal sense, and that the daughter took only such of the securities as he owned at the time of his death. In that case there had been the delivery of a copy of the paper by the signer to his mother in a sealed envelope with the statement that she was to keep it carefully and not to tell Marie about it, as he did not want her to get the idea that she had money.

In Govin v. De Miranda, 76 Hun (N. Y.) 414, 27 N. Y. Supp. 1049, the decedent had signed and acknowledged before a notary the following instrument:

"State and City of New York, May 25, 1881.

"For the sum of $1 to me in hand paid, the receipt of which is hereby acknowledged, and for certain other valuable considerations, I do hereby transfer, set over and deliver to the young man known as Felix Govin Diaz, a native of Matanzez, Island of Cuba, now living at No. 147 East Thirty-Ninth street, in the city of New York, two certificates for $10,000 each ($20,000) of the United States four and one-half per cent. loans, under the act of Congress entitled 'An act to authorize the refunding of the national debt,' approved July 14, 1870, issued on January 18, 1878, letter A, 13,235, and the other one issued May 17, 1877, letter A, 10642. Said certificates will be retained in my custody for the present as trustee for the said Felix Govin Diaz.

"Felix Govin y Pinto [L. S.]

"Instead of two certificates only one of ten thousand dollars."

The court held that notwithstanding the statement that the signer of the paper retained the certificates "as trustee" that it was clear he did not intend to divest himself of title inasmuch as after the execution of that declaration he had sold the bonds. Besides there was no evidence that the party sought to be charged as trustee had ever delivered the writing which was found in his safe after his death. Upon that point the court said:

"It is a common error to suppose that execution means the signing and acknowledging of an instrument. But there is another requisite which is equally necessary to its due execution, namely, its delivery. * * *

"Applying this rule to the facts of the case at bar, the signing and acknowledgement of the instrument in question without delivery did not complete its execution. It would be a dangerous rule to adopt that simply because a man signed an instrument and acknowledged it, and kept it in his possession and then died, that the party who would have been entitled to claim

under said instrument, had it been delivered to him, could, notwithstanding this failure to deliver, claim thereunder after the decease of the party signing it."

In the instant case it is not left to inference what the intention of Max W. Stoehr, the complainant, was in signing the declaration of trust. The sworn testimony of the complainant, which we have no reason for believing untrue, is in the record. The reason for the document was the protection of the complainant's father and brother, who had transferred to him their American interests, in case anything happened to the complainant before he succeeded in transferring to them his interests in the properties in Germany in return for their transfer to him of their interests in the American properties of which he was already in possession. As he succeeded in making this transfer of the German properties before anything "happened" to him, the declaration which he signed and retained in his possession never became operative as the condition upon which it was intended to take effect never occurred.

[6, 7] But there is another aspect of this case which must now be stated, and which is fatal in our opinion to the claim that the property represented by the trust certificates was the property of Eduard and Georg Stoehr, alien enemies. In the case of a trust the creator of the trust cannot compel a third person to be the trustee against his consent, but his acceptance of the office is necessary to constitute him trustee and to vest the title in him. It is equally true that property cannot be forced upon a cestui que trust against his will, and a valid trust does not exist if the cestui que trust when informed of it clearly and unequivocally rejects or renounces its benefits. Arnold v. Jones, 9 Lea (Tenn.) 545; Breedlove v. Stump, 3 Yerg. (Tenn.) 257; Libby v. Frost, 98 Me. 288, 56 Atl. 906; White v. White, 107 Ala. 417, 18 South. 3.

[8, 9] Any equitable rights arising from a declaration of trust are at an end after the renunciation and the settlor holds the title to the res free and clear of the trust. If the cestui que trust when he learns of the trust accepts it his acceptance relates back to the date of the declaration. If he repudiates it when he learns of it his repudiation relates back in the same manner and the title must be regarded as having been in the settlor all of the time.

[10] The record in this case discloses that the cestuis que trustent under the declarations herein involved renounced their rights in them when they learned of their existence, which was not until January, 1922. This court is not concerned with the motive which may have induced the renunciation. The cestuis que trustent were in honor and in all good faith bound to renounce. But if their renunciation had been made in order to defeat the seizure which the Alien Property Custodian had made it would be quite immaterial. They owed no duty to the United States, and the seizure of the property by the Alien Property Custodian did not deprive them of their right to renounce. We fail to see how their renunciation defeated any lawful purposes of the Trading with the Enemy Act. If the consequence of the renunciation is to revest the property in the hands of an American citizen no wrong to the United States is done.

[11, 12] But it is said a constructive trust existed and upon that contention great reliance seems to be placed to sustain the seizure. Constructive trusts are those which arise purely by construction of equity, and wholly independent of any actual or presumed intention of the parties. It is undoubted that if one is so placed in relation to another that he becomes interested with him in any property or business he is prohibited from acquiring rights in that property or business antagonistic to the person with whose interest he has become associated. The leading case asserting that doctrine is Keech v. Sandford, White & Tudor's Leading Cases in Equity, vol. 1, pt. 1, 44. In this case, otherwise known as the Rumford Market Case, the trustee renewed in his own name a lease which belonged to his cestui and was about to expire, as the lessor had refused to grant renewal to the cestui who was an infant. It was held that the trustee although he took in his own name must be held as a trustee for the infant and would be required to account to him for the profits. And this doctrine is applied not merely to trustees, but to persons standing in a direct fiduciary relation towards others. It is enforced for example as between an agent and his principal and between partners. Bispham's Equity (8th Ed.) § 93; Anderson v. Lemon, 8 N. Y. 236; Cushing v. Danforth, 76 Me. 114; Roby v. Colehour, 135 Ill. 300, 25 N. E. 777.

Moreover a constructive trust arises if the American partners being unauthorized to do so by Eduard and Georg transferred the assets in the partnership to the corporation and issued the shares to Max.

Applying the doctrine of constructive trusts to the facts of the instant case we are asked to hold that this complainant in taking in his own name the shares to all the stock in Stoehr & Sons, Inc., when it was organized and the assets of the original partnership were turned over to it including the interests therein of Eduard and Georg, became a constructive trustee for Eduard and Georg of such a proportionate part of the shares in the corporation as the father and brother had in the assets of the partnership. Assuming, if we apprehended the argument, that an understanding existed between all parties that the corporation was to be formed and the assets of the partnership were to be turned over to the corporation, and that the shares of stock were to be issued to the complainant, it was nevertheless a part of the plan that this complainant was to transfer all his interests in the German properties to Eduard and Georg and as he took the American shares without having made the transfer of his interests in Germany he was a constructive trustee of that proportion of the American shares to which his father and brother were entitled.

[13] It is to be remarked, however, that assuming a constructive trust Eduard and George as possible cestuis que trustent never acquired or asserted any interest in these shares in Stoehr & Sons, Inc., and that at most they never had more than a right to claim a constructive trust. The right of Eduard and Georg was a right of election to proceed in personam for damages or in rem against the shares. For there can be no doubt that the legal title to the shares had passed to Max by what had been done. That fact we do not understand is challenged. When the corporation, upon its organization, issued the shares

to Max he certainly got the legal title. If the German partners had a right to object and to elect to impress a constructive trust upon them, they never asserted it. and when they accepted the German properties as a consideration for their shares the possibility of a constructive trust was at an end and the complainant's ownership became absolute in law and equity. The constructive trust never came into existence because if the right to elect to assert it existed it was never exercised, and the right to assert it came to an end when Eduard and Georg accepted the German properties which the complainant transferred to them. So that a constructive trust at no time existed for it could not arise until the cestuis que trustent elected to assert it—and this they never did.

To recapitulate, the declarations of trust never became operative and did not invest Eduard and Georg, alien enemies, with the equitable title to the shares of stock to which they refer. This must be so inasmuch as the condition upon which those declarations alone were intended to operate never happened. Moreover, Eduard and Georg when informed that the declarations of trust existed renounced any rights therein and cestuis que trustents cannot be created such against their will. And further neither Eduard nor Georg were ever the equitable owners of the American stock under any theory of a constructive trust, for they never elected to assert any rights under a constructive trusteeship which rights were personal to them under the doctrine of election, and the conditions under which their right of election might have been exercised, assuming they ever had such a right, have passed.

The Trading with the Enemy Act, whether taken as originally enacted 40 St. 411, or as since amended 40 St. 459; 40 St. 1020; 41 St. 35; 41 St. 977, gave to the Alien Property Custodian no authority to seize property other than "property in the United States due or belonging to an enemy, or ally of an enemy." And as the property which he seized and which is the subject of this suit was not such property, he had no authority to seize it and has no right to retain it.

As this suit for the recovery of this property has been brought in the manner authorized in section 9 of the Trading with the Enemy Act, it was error to dismiss the bill.

The decree is reversed, with directions to reinstate the bill and grant the relief prayed for therein.

