**In re O.P.M. LEASING SERVICES, INC., Debtor.**

**James P. HASSETT, as Chapter 11 Trustee of O.P.M. Leasing Services, Inc., Plaintiff,**

**v.**

**FAR WEST FEDERAL SAVINGS AND LOAN ASSOCIATION, Euramlease, Inc. and Henry L. Bauer, as Trustee for Euramlease, Inc., Defendants.**

**Bankruptcy No. 81 B 10533.
Adv. No. 81–5670 A.**

United States Bankruptcy Court,
S.D. New York.

May 18, 1984.

Zalkin, Rodin & Goodman, New York City, for trustee; Henry L. Goodman and Harold N. Schwinger, New York City, of counsel.

Richards, O'Neil & Allegaert, New York City, for Far West Federal Sav. and Loan Ass'n, Henry C. Bauer as Trustee for Euramlease, Inc. and Euramlease, Inc.; Winthrop J. Allegaert and Brad Steenland, New York City, of counsel.

## DECISION AND ORDER AFTER TRIAL ON TRUSTEE'S COMPLAINT SEEKING AVOIDANCE OF TRANSFERS ON FRAUDULENT CONVEYANCE AND OTHER GROUNDS

BURTON R. LIFLAND, Bankruptcy Judge.

### I. *Introduction*

In this adversary proceeding, James P. Hassett, the Chapter 11 trustee ("Trustee") of O.P.M. Leasing Services, Inc. ("OPM"), a computer leasing concern, seeks to recover certain sums from the defendants Far West Federal Savings and Loan ("Far West"), Euramlease, Inc. ("Euramlease") and Henry L. Bauer as trustee for Euramlease ("Bauer"), allegedly obtained as a result of fraudulent conveyances, preferences, or postpetition transactions.

Each of the varied transactions scrutinized in this decision are tested by the full panoply of a trustee's avoiding powers ap-

plied singly or in combination. The transactions at issue took place at a point in time when the parties' economic and performance expectations no longer conformed to their original written agreements. Almost all of the transactions are found herein vulnerable to the trustee's avoiding powers.

At a trial based predominantly upon documentary evidence, parts of the transcripts containing the depositions of Far West by Kenneth L. Schmit and Edwin Sweeting, the deposition of Euramlease by William P. Umbs, and the deposition of the trustee for Euramlease by Henry L. Bauer were read into the record as evidence in chief. Trial witness testimony was minimal.

OPM filed its voluntary petition in this Court on March 11, 1981, under Chapter 11 of the Bankruptcy Reform Act of 1978 ("the Code"). On October 15, 1981, the Trustee commenced this adversary proceeding. The Trustee asserts claims against Far West, located in Oregon, Euramlease, a New York corporation, and Bauer, on various grounds and under Code Sections 544, 547, 548, 549, 362 and under Sections 270 *et seq.* of New York's Debtor and Creditor Law ("DCL").

## A. *Payments the Trustee Seeks to Avoid*

The payments the Trustee claims were fraudulent conveyances may be categorized into five groups.

The first group consists of five payments made by OPM to Euramlease on behalf of Far West between December 1979 and April 1980.

The second group consists of reimbursement in advance by OPM to Far West for three monthly rental payments for May through July 1980 (more fully described hereinafter).

The third group consists of payments made into a trust account established by OPM at Far West ("Account" or the "Trust Account"). Euramlease was the purported beneficiary of this Trust Account even though it did not consent to it or even know of its existence.

The fourth group of payments were made by OPM to Far West pursuant to an afterthought or sham sublease agreement.

The fifth group of payments the Trustee seeks to recover are postpetition transfers from the Trust Account made by Bauer and paid to Far West.

This Court finds that the payments made by OPM in the first four categories were gratuitous, not legally required, and unsupported by consideration. They may therefore be recovered by the Trustee as fraudulent conveyances pursuant to the Code and state law. The fifth group of payments may be avoided by the Trustee as postpetition transfers made in violation of the Code's automatic stay provision.

## B. *Applicable Law*

Most of the Code provisions relevant to this decision deal with the broad powers of a trustee, who in this case is a chapter 11 trustee, to avoid transfers of property of the estate.

█ Code § 544(b)[1] enables the trustee to avoid transfers that are voidable under applicable state law by a creditor holding an allowed, unsecured claim under § 502.[2] By referring to state law to determine whether a transfer may be avoided, "the trustee's powers of avoidance under section 544(b) are not circumscribed by the time period, or other restrictions, to be found in sections 547 and 548." 4 *Collier on Bankruptcy* ¶ 544.03[1] at 544–15 (15th ed. 1983) (footnotes omitted). Frequently this period

1. Code § 544(b) provides:
 The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(c) of this title.

11 U.S.C. § 544(b) (1983).

2. Code § 502 provides in pertinent part:
 (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.
 11 U.S.C. § 502(a) (1983).

is longer than the one-year limitation of Code § 548, discussed below, thereby enabling the trustee to reach further back to recover more for the estate.

Under the authority of Code § 544(b) and New York DCL, the Trustee here may recover the payments made by OPM to Far West pursuant to an April 1980 agreement, the payments made to Euramlease between December 1979 and April 1980, the payments made by OPM to Far West pursuant to a sublease which this Court determines to be a sham, and the payments into the Trust Account.

■ Code § 547(b) enables a trustee to avoid preferential transfers made ninety days before the debtor filed its petition. The trustee seeking to avoid the transfer has the burden of proving all of the statutory elements of a preference.[3] Failure to do so will prevent the avoidance of the transfer pursuant to that section. 4 *Collier on Bankruptcy* ¶ 547.01 at 547–12.

The Trustee seeks to recover under Code § 547(b) three out of six payments made within 90 days of the filing of the bankruptcy petition pursuant to the sham sublease between Far West and OPM. The Trustee's failure to discharge his burden of proof under this section, as detailed *infra*, is not fatal because he may nonetheless recover these payments under the webbing of Code § 544(b).

■ Although Code § 548 is not explicitly pleaded in the Trustee's Amended Complaint, this Court will nonetheless consider its possible applicability to the instant case. A court may examine a complaint to determine whether it justifies relief "under any legal theory." *Thompson v. Allstate Insurance Co.*, 476 F.2d 746, 749 (5th Cir. 1973). Code § 548[4] is the codification of Sections 4, 5, 6 and 7 of the Uniform Fraudulent Conveyance Act. *See* 4 Collier on Bankruptcy ¶ 548.02 at 548–22. Like Code § 544(b), it enables a trustee to avoid transfers made either with actual intent to defraud or constructive intent implied in law based upon less than reasonably equivalent consideration while the debtor was insolvent. *See* 4 Collier on Bankruptcy ¶ 548.02 and 548.03. However, unlike Code § 544(b), § 548 may be used only to avoid transfers effected within one year of the

---

3. Code § 547(b) provides in pertinent part:
 [T]he trustee may avoid any transfer of property of the debtor—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between 90 days and one year before the date of the filing of the petition, if such a creditor, at the time of such a transfer—
 (i) was an insider; and
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 (5) that enables the creditor to receive more than he would receive if—
 (A) the case were a case under Chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 11 U.S.C. § 547(b) (1983).

4. Code § 548 provides in pertinent part:

§ 548 Fraudulent transfers and obligations
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or
(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B) (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
 (ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a) (1983).

filing of the debtor's petition. Because of the one-year limitation, if this section applies, it will enable the Trustee to avoid only the last two of the five payments in the first group of payments made by OPM to Far West between December 1979 and April 1980 as well as all of the payments made in the second, third and fourth groups enumerated above.

Under Code § 549(a)[5] a trustee may avoid postpetition transfers of property of the estate made without the Bankruptcy Court's consent. The trustee must bring any claims under this section within the earlier of two years from the time of the transfer and the time the case is closed or dismissed. *See* Code § 549(d).[6]

Pursuant to § 549, the Trustee seeks to recover postpetition transfers made from the Trust Account by Bauer and Far West as well as the remaining balance in the Account. As discussed *infra*, he may do so.

Code Section § 362[7] imposes an automatic stay, upon the filing of the debtor's petition, of actions "which would affect or interfere with property of the estate, property of the debtor, or property in the custo-dy of the estate." 2 *Collier* ¶ 362.01[1] at 362–6. The automatic stay is broad in scope and "continues until the property is no longer property of the estate." 2 *Collier* ¶ 362.06 at 362–43. Upon a proper showing, a creditor may obtain relief from the stay by bringing on a motion for that purpose. 2 *Collier* ¶ 362.08 at 362–52. Where an act or action is knowingly brought or committed in violation of the automatic stay, "contempt is an appropriate remedy," although inadvertent violations should not be so punished. 2 *Collier* ¶ 362.11 at 362–58–59, citing *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976), *cert. denied* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).

A detailed description of the transactions which gave rise to the payments sought to be avoided by the Trustee will provide the factual framework of this Opinion, as well as a piquant glimpse at the nether side of business.

## II. *Factual Background*

In October 1977, OPM as lessor and Far West as lessee entered into a Master

---

**5.** Code Section 549(a) provides in part:
 (a) Except as provided [otherwise], the trustee may avoid a transfer of property of the estate—
 (1) that occurs after the commencement of the case; and
 (2)(A) that is authorized under section 303(f) or 542(c) of this title; or
 (B) that is not authorized under this title or by the court.
 11 U.S.C. § 549(a) (1983).

**6.** Code Section 549(d) provides:
 (d) An action or proceeding under this section may not be commenced after the earlier of—
 (1) two years after the date of the transfer sought to be avoided; and
 (2) the time the case is closed or dismissed.
 11 U.S.C. § 549(d) (1983).

**7.** Code Section 362 provides in part:
 (a) Except as provided [otherwise,] a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—
 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the com-mencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
 (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
 (3) any act to obtain possession of property of the estate or of property from the estate;
 (4) any act to create, perfect, or enforce any lien against property of the estate;
 (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
 (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and
 (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.
 11 U.S.C. § 362 (1983).

Lease. The Master Lease was to govern all subsequent leasing transactions entered into by the parties. These transactions were to be referred to as "Equipment Schedules" ("ES"). In March 1978, OPM as lessor and Far West as lessee entered into ES–3, which incorporated the terms and conditions of the Master Lease. Pursuant to ES–3, OPM leased a computer and related equipment ("the ES–3 equipment") to Far West for 60 months beginning on May 1, 1978. The rental payments were $26,185.00 per month for the first 12 months, and $29,110.00 for the remaining 48 months.

On May 2, 1978, OPM executed a nonrecourse promissory Note payable to defendant Euramlease in the amount of $1,337,-230.96, under a Note Agreement dated March 21, 1978, as security for a loan made by Euramlease to OPM. The Note was collateralized by a Security Agreement, also dated March 21, 1978, and executed by OPM and Euramlease. Pursuant to the terms of the Security Agreement, OPM assigned all of its right, title and interest in ES–3, including its interest in the ES–3 equipment and the monthly rentals payable under ES–3, to Euramlease.

Also on March 21, 1978, Far West executed a Consent whereby Far West agreed to pay the ES–3 lease rents directly to Euramlease, OPM's assignee, under a "hell or high water" clause. As used by OPM in its lease agreements, the "hell or high water" clause required the lessee to pay rent for the equipment for the entire lease term, regardless of any equipment failure or any failure by OPM to perform its obligations under the lease. *In re OPM Leasing Services, Inc.*, 81 B 10533 (BRL) *Report of the Trustee dated April 25, 1983 Concerning Fraud and Other Misconduct in the Management of the Affairs of the Debtor* at 66 ("Trustee's Report"). The same "hell or high water" clause was incorporated into the Master Lease. The Consent also required Far West to notify Euramlease in writing of all actions Far West would take under ES–3, (including actions taken under Sections 5(a) and 5(b), *infra*,) and to amend

ES–3 or remove the ES–3 equipment only with prior written consent of Euramlease.

Under Section 5(a) of ES–3, Far West could opt to upgrade its equipment any time after November 1, 1979. The Upgrade Provisions, however, required Far West to deliver an Upgrade Notice of its intention to OPM and to consummate a lease for the new equipment.

The exercise of the Upgrade Provisions would trigger the Special Sublease Option under Section 5(b) of ES–3. This Special Sublease Option required Far West to give OPM 120 days prior written notice of its intent to exercise the Special Sublease Option. In addition, if Far West decided to exercise the Special Sublease Option, upon notice to OPM of its intention, Far West would become obligated to pay a certain "Notice Amount" to OPM or its assignee Euramlease. The "Notice Amount" was specified in a table that was part of ES–3 and decreased as the number of months from the signing of the first equipment schedule elapsed. Under the Special Sublease, Far West could "sublease" the ES–3 equipment to OPM as sublessee for a term to expire immediately before the expiration date of ES–3 and for the same monthly rental payment contained in ES–3. Far West's exercise of the Special Sublease would not relieve it of any of its obligations under ES–3 including all rental payments.

In the summer of 1979, Far West apparently indicated to OPM its intention to exercise the ES–3 Upgrade Provision by means other than written notice as required by ES–3. Although it was obligated by the Consent to apprise Euramlease of its intentions, Far West failed to do so. On August 30, 1979, OPM as lessor and Far West as lessee entered into ES–5, pursuant to which OPM leased to Far West certain other computer equipment. Far West never provided written notice to OPM or Euramlease of its intention to enter into ES–5, even though it was an upgrade schedule within the purview of Section 5(a) of ES–3. Far West also failed to pay the Notice Amount to OPM or Euramlease and failed to execute a special sublease as required by

Section 5(b) of ES–3. In short, Far West's failure to insist that OPM adhere to the terms of ES–3, coupled with Far West's own failure to comply with the lease formalities, requires a finding that the lease was never upgraded and, in turn, causes Far West's present predicament.

On November 9, 1979, Far West, at OPM's direction, delivered the ES–3 equipment to an outside (IBM) refurbishing center. Far West again failed to notify Euramlease that OPM and Far West had agreed to remove the equipment from Far West's premises. Having no knowledge, Euramlease could not and indeed never did consent to this removal, although its consent was required by ES–3. Euramlease's lack of knowledge explains why the Notice Amount payments were never triggered— Euramlease was unaware of any circumstances that would require these payments to be made. Far West did not pay the ES–3 rents from December 1979 through April 1980, even though it was required to do so pursuant to the hell or high water clause. Instead, OPM paid Euramlease directly, again in contravention of ES–3. These payments constituted the first group of payments mentioned in the Introduction.

On December 28, 1979, OPM as lessor and Hartz Mountain Corp. ("Hartz") as lessee entered into a lease for most of the ES–3 equipment. The term of the lease was 36 months at a monthly rental of $2,300.00, an amount far short of the previous $29,110 rental stream. It is not clear whether this new amount represents the true rental value of the depreciated equipment or not.

On February 11, 1980, Mel Durao, a Vice-President of OPM, wrote to Far West stating that OPM would undertake Far West's obligations under ES–3 and would pay the Note held by Euramlease in full by April 1, 1980. OPM was under no legal obligation to repay the Note because Euramlease had agreed to accept OPM's assignment of its right to receive the ES–3 rents which were to be paid come "hell or high water," and to apply those rental payments to satisfy OPM's original obligation on the Note.

All of the preceding events occurred without Euramlease's knowledge. According to testimony at trial, Euramlease first discovered during a routine check performed around April 1980 that Far West no longer had the ES–3 equipment. Euramlease then notified Far West that it was in default of the terms of the Consent and of ES–3. In response to Euramlease's threat that it would accelerate payments under ES–3, at Far West's request, Far West and Euramlease entered into a letter agreement dated April 24, 1980 ("Euramlease Agreement") in which Far West acknowledged its defaults and Euramlease agreed not to accelerate payments under ES–3 provided that Far West pay all ES–3 rents directly to Euramlease, advise it of the location of the ES–3 equipment, and reconfirm its obligations to Euramlease under ES–3 and the Consent. Further patchwork efforts to avoid the consequences of the defaults ensued.

On April 30, 1980, Far West and OPM entered into a letter agreement ("April 1980 Agreement") in which OPM agreed to reimburse Far West in advance for all ES–3 rents Far West would pay to Euramlease beginning May 1, 1980 and to repay the Note in full by August 1, 1980. Again, this agreement was made without Euramlease's knowledge or consent. Uncontroverted trial testimony indicates that Far West "turned around" OPM's funds and paid them to Euramlease. These payments constitute the second group of payments referred to in the Introduction as reimbursement in advance.

In August 1980, OPM and Far West modified their April 1980 agreement and agreed that OPM would repay the Note by depositing monies into the Trust Account at Far West. Henry L. Bauer, an attorney representing Far West, agreed to serve as the trustee and to hold these monies in trust for Euramlease. At no time did Euramlease acquiesce in this arrangement or accede to any arrangement that would alter Far West's irrevocable and unmodifiable obligations directly to it.

The Account was established as an interest-bearing passbook savings account at Far West. Significantly, it bore OPM's tax identification number because OPM was liable for the payment of all income taxes on all interest accruing on it. In their Joint Pre-Trial Order, the parties agreed that OPM made an initial deposit of $239,110.00 to which Far West transferred an additional $100,000.00 it had previously received from OPM. Far West agreed to send OPM quarterly statements. The terms of the August 1980 agreement provided that when the amount in the Account equalled the balance due on the Note, the Account would be closed and any balance plus all interest would be sent to Euramlease in full payment of the Note. Any excess above the balance due on the Note would be remitted to OPM. When OPM filed its petition, there were insufficient funds in the Trust Account to satisfy the Note. These payments comprise the third group of payments the Trustee seeks to recover for the estate, the payments made into the Trust Account.

The August 1980 agreement also contained a sham agreement of sublease between Far West and OPM. This so-styled sublease occurred almost one year after the equipment was returned, refurbished, and re-leased to another OPM customer. Far West as sublessor belatedly "leased" the ES–3 equipment to OPM as sublessee at a monthly rent of $29,110.00. This amount was equal to the ES–3 rent payments Far West was required to pay to Euramlease. This is no coincidence. Via the device of the "sublease," OPM and Far West apparently attempted to conceal the fact that OPM was the true source of the monies being paid by Far West to Euramlease as ES–3 rent. These monthly payments made between August 1980 and February 1981 comprise the fourth group of payments the Trustee seeks to recover for the estate. OPM paid Far West a total of $261,990.00 pursuant to the April 1980 and August 1980 Agreements. OPM also deposited a total of $574,660.00 into the Trust Account.

Immediately after the filing by OPM of its Chapter 11 petition on March 11, 1981, Bauer, acting as trustee for Euramlease, withdrew the Account balance from the savings account in which it had been maintained, closed the account, and placed the balance into a certificate of deposit at Equitable Savings & Loan Association. Bauer, as trustee, thereafter withdrew the sum of $203,770.00 from the Account and paid that amount to Far West. Bauer also withdrew from the Account $145,550.00 on January 4, 1982 and $116,440.00 on April 15, 1982 and paid those amounts to Far West, although this adversary proceeding had been commenced on October 15, 1981. Furthermore, the parties stipulated in the Joint Pretrial Order that OPM was insolvent as defined by § 101(26) of the Code and § 271 of the DCL on and after December 1979. The Trustee asserts that because Euramlease was the sole beneficiary of the Account, and Euramlease refused to accept such interest, OPM as settlor and reversioner is entitled to the Account funds. In addition, the OPM Trustee also claims that Far West's direct payment with its own funds of the Euramlease Note defeated the primary purpose of the Account, since Bauer never actually paid any of the Account monies to Euramlease.

These payments represent the fifth group of transfers the Trustee seeks to avoid, those made postpetition and in violation of Code § 362's automatic stay.

III. *The Pleadings*

Hassett's first claim is against Far West and Euramlease, and alleges by tracking the language of Code § 544(b) and §§ 273–276 of the DCL that he is entitled to avoid the transactions described more specifically above. The Trustee's grounds for avoidance are that these transactions were made without fair consideration or pursuant to obligations which were incurred by OPM without fair consideration, and that the payments were made and the obligations incurred with actual intent to hinder, delay and defraud OPM's creditors. These transactions consist of:

a) five allegedly voluntary payments, totalling $145,550.00, made by OPM to Euramlease between December 1979 and April 1980, representing amounts that Far West was obligated to pay Euramlease under ES–3;

b) allegedly gratuitous payments made from and after May 1980 including reimbursements in advance and sham sublease payments as a result of OPM's voluntary incurrence of liability to reimburse Far West for all rental payments under ES–3, totalling $778,430.00;

c) the payments of money by OPM into the account Bauer held as trustee for Euramlease; and

d) payment by OPM in November 1980 of $10,467.38 to the law firm of Cole & Deitz, which firm acted as counsel to Far West or Euramlease.

In his second claim against Far West, Euramlease and Bauer, Hassett asserts a right to recover the balance in the Account plus all interest, because the express condition upon which the Account was established failed to occur.

The plaintiff's third claim against Far West, Euramlease and Bauer, asserts that "Far West and Euramlease did not have, as of March 11, 1981, a security interest or lien upon the Account ... or any other interest therein, which was superior to the rights of plaintiff in the Account under Code section 544(a)." Accordingly, states Hassett, any appropriation of the Account or its proceeds after March 11, 1981 constitutes a voidable transfer of property of the estate under Code § 549(a), for which defendants are jointly and severally liable.

For his fourth claim, Hassett seeks to recover from Far West three payments plus interest from the date of each, made within 90 days of the date that OPM filed its Chapter 11 petition, as voidable preferences under Code § 547(b).

Hassett's fifth claim, against Far West, asserts that the Trust Account was "an illusory trust and ineffective as a means for providing collateral security to defendant Far West with respect to any liabilities owing to it from OPM," and that therefore

he has a right to recover amounts paid to Far West from the Trust Account after March 11, 1981, as well as any balance presently in the Account, plus interest. In addition, Hassett asserts that following his demand therefore, Far West's refusal to pay this amount constitutes a wrongful post-petition conversion and appropriation of property of the estate in violation of Code § 549(a).

Plaintiff's sixth and final claim against Far West asserts that Far West's failure to turn over the Account and postpetition transfers therefrom constituted knowing and wrongful violations of Code §§ 362 and 549(a).

Hassett demands judgment against Far West for $934,447.38, plus interest from the date of each payment, and jointly and severally against Euramlease for that portion of the amount it received. In addition, he demands that if the Account still exists and has not been appropriated, then Bauer should be directed to turn it over to him with all accrued interest in return for which Far West and Euramlease will receive a credit against the judgment plaintiff seeks. Finally, Hassett asserts that Far West should be required to: (a) pay plaintiff's legal expenses to recover the property; (b) bear all other monetary damage incurred by the estate by reason of being deprived of the property; and (c) pay punitive damages resulting from Far West's wilful conversion.

In their amended answer ("Answer"), Far West and Bauer assert two counterclaims, the first of which has been abandoned. Defendants' second counterclaim asserts that the Trustee owes Far West the reasonable rental value of the ES–3 equipment since February 1, 1981.

The Trustee's Reply generally denies Far West's counterclaims and pleads eight defenses, including: a) failure to state a claim upon which relief may be granted; b) Far West and Bauer are not entitled to receive any rental payments for the sublease equipment because Far West's termination in November 1979 of the ES–3 agreement

also terminated the Sublease and in any event the Sublease expired by August 31, 1982; c) Far West and Bauer may not recover any Sublease rent that may have accrued postpetition as an administrative expense; d) Far West and Bauer, as unsecured creditors, lack standing to assert pre- or postpetition counterclaims against OPM or the Trustee; e) Far West and Bauer are barred from asserting their counterclaims until they pay an amount the Trustee claims they owe OPM representing preferential payments and fraudulent transfers; and f) Far West and Bauer waived any right to recover possession of the subleased equipment.

Euramlease has cross-claimed against Far West for a judgment in the amount that it might be directed to pay the Trustee. Euramlease did not file an Answer to the Amended Complaint which contained no additional allegations against it. Although Far West and Euramlease initially were represented by different counsel, Euramlease, after receiving a written agreement of indemnity from Far West, abandoned its cross-claim and is now also represented by the same counsel as Far West and Bauer.

IV. *Issues Presented*

The legal issues presented for determination after trial on this adversary proceeding are:

1. Whether Oregon law or New York law should be the "applicable law" under Code § 544(b).

2. Whether the following transfers made and obligations incurred by OPM are voidable by the Trustee under Code § 544(b) and DCL § 270 *et seq* and Code § 548 (with respect to transactions within one year of the date of the filing of OPM's Chapter 11 petition):

 a. The reimbursement by OPM in advance for three months rent totalling $87,330.00 to Far West pursuant to the April 1980 agreement

 b. The payment of $174,660.00 to Far West between August 1980 and February 1981 pursuant to the August 1980

agreement purportedly creating a "sublease" between these parties

 c. The payment by OPM directly to Euramlease of $145,550.00 between December 1979 and April 1980 in satisfaction of Far West's ES–3 rent obligation and in derogation of the written agreements between the parties;

 d. The deposits into the Trust Account between June 1980 and February 1981 totalling approximately $574,660.

3. Whether the law of New York or the law of Oregon controls the interpretation of the August 1980 agreement and the validity of the Trust Account

4. Whether the August 1980 agreement established a valid trust.

5. Whether Bauer as trustee of the Account breached his fiduciary duty as trustee in paying Account funds to Far West postpetition.

6. Whether Far West and Bauer willfully violated Code § 362 by transferring Account funds post-petition.

7. Whether three rental payments under the "sublease" made by OPM to Far West within 90 days of the filing date as a preference under Code § 547(b) in that they were made for or on account of an antecedent debt.

V. DISCUSSION OF LAW

A. *Whether New York or Oregon law Should Apply To the Alleged Fraudulent Conveyances and Preferences*

In determining whether the law of New York or Oregon should be the law applied under Code Section 544(b), the first question to be examined is which state's choice of law rule should apply. Where, as here, the parties have not indicated their choice of law, a federal court sitting in diversity must look to the choice of law rules of the jurisdiction in which it sits to determine which state's law applies. *Klaxon v. Stentor Electric Manufacturing, Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the case at bar, therefore, New York's choice of law rules must be applied to the fraudulent conveyances and

preferences at issue. The question of choice of law with regard to the validity of the trust fund will be discussed *infra.*

█ New York courts apply two different choice of law approaches in the area of tort law, the "center of gravity" approach and interest analysis. "Center of gravity" is the older rule whereby a court "give[s] controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). New York courts following more recent developments in conflicts of law apply an interest analysis. In pursuing an interest analysis, a court looks to the policies behind both states' laws and thereby determines which state has a "superior interest" in having its laws applied to the issue before it. *See Rosenthal v. Warren,* 475 F.2d 438, 442 (2d Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973); *Fox v. Peck Iron & Metal Co., Inc.,* 25 B.R. 674, 684–87 (Bkrtcy.S.D.Cal.1982), *Tooker v. Lopez,* 24 N.Y.2d 569, 574, 301 N.Y.S.2d 519, 523, 249 N.E.2d 394, 397 (1969).

Thus, both kinds of choice of law analyses are available to courts sitting in New York. *See Croft v. Nat'l. Car Rental,* 56 N.Y.2d 989, 453 N.Y.S.2d 631, 439 N.E.2d 346 (1982) (applying both center of gravity and interest analysis); *Cousins v. Instrument Flyers, Inc.,* 44 N.Y.2d 698, 405 N.Y. S.2d 441, 376 N.E.2d 914 (1978) (applying center of gravity analysis); *Towley v. King Arthur Rings, Inc.,* 40 N.Y.2d 129, 368 N.Y.S.2d 80, 351 N.E.2d 728 (1976) (applying interest analysis); *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972) (applying interest analysis).

The Second Circuit in *Aaron Ferer & Sons Ltd. v. The Chase Manhattan Bank, N.A.,* 731 F.2d 112 at 120–21 (2d Cir.1984), ultimately decided to apply New York law to the resolution of the restitution and tort issues in that case. For its choice of law rules, the *Ferer* court utilized a center of gravity analysis for the restitution issue and used a combination of center of gravity and interest analysis to resolve the tort issues. *See also Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981).

Although OPM and Far West in section 19.5 of the Master Lease selected New York law to determine questions regarding the construction of both the Master Lease and ES–3, the issue of which state's law, New York's or Oregon's,[8] governs the transfers of money claimed by the Trustee to be fraudulent is not within the scope of the Master Lease's choice of law provision. It is this Court's belief that interest analysis yields "the more just, fair and practical result ... by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation." *Neumeier v. Kuehner,* 31 N.Y.2d at 128, 335 N.Y.S.2d at 69, 286 N.E.2d at 457.

This Court concludes upon the following application of an interest analysis, whereby I will compare the substantive law in New York to that of Oregon, that the State of New York has a greater interest in having its law of fraudulent conveyances applied than does the State of Oregon. However, as detailed *infra,* with regard to the validity of the Account, it is the law of Oregon that must apply because the law of the situs of a trust governs its validity.

### 1. *New York Substantive Law*

In its placement of the burden of going forward with proof of the debtor's solvency on the transferee who seeks to prevent the avoidance under circumstances demonstrating a lack of fair consideration for the transfer, the law of New York demonstrates a policy generally geared toward protecting New York creditors. Thus, the State of New York does indeed maintain a

---

**8.** Far West is located in Oregon, while OPM is a New York corporation.

great interest in having its law applied here.

■ The Trustee seeks to invoke Code Section 544(b) so as to set aside the various transfers described *infra* as fraudulent conveyances. In the instant case, Code Section 544(b) requires proof that a fraudulent conveyance took place under the New York Debtor and Creditor Law. The Trustee thus must demonstrate that there existed an actual unsecured creditor at the time of the transfer whose shoes the Trustee may step into so as to avoid the transfer under applicable state law. *See Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

Under state law, specifically, DCL § 273, the requirement of proof of intent to effectuate a fraudulent conveyance may be satisfied by showing of the debtor's insolvency. Section 273 of the DCL provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to his creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

New York DCL § 273 (McKinney 1945).

In applying Section 273 of the New York DCL, courts have raised a presumption of insolvency where, as here, a debtor has transferred his property without consideration when debts are outstanding. *See In re Tabala*, 11 B.R. 405, 408 (Bkrtcy.S.D.N.Y.1981). Judge Augustus Hand in *Feist v. Druckerman*, 70 F.2d 333 (2d. Cir.1934), declared that this presumption of insolvency requires the transferee to go forward with proof of the solvency of the transferor. He stated:

> Now, there is a rule of long standing in the New York Courts that a *voluntary* conveyance made when the grantor is indebted is presumptively fraudulent. We think this means that, if one indebted makes such a transfer, it is presumed, in the absence of some proof to the contrary, that he was then insolvent. *Cole v. Tyler*, 65 N.Y. 73; *Smith v. Reid*, 134 N.Y. 568, 31 N.E.

1082; *Kerker v. Levy*, 206 N.Y. 109, 99 N.E. 181; *GaNun v. Palmer*, 216 N.Y. 603, 111 N.E. 223. [per Cardozo, J].

· · ·

> It imposes on the volunteer transferee of one who has creditors the duty of going forward with proof to show solvency of the transferor in order to prevent the conveyance from being set aside.

*Id.* at 334, *quoted in In re Tabala, supra.* Accord, *In re Franklin National Bank*, 2 B.R. 687, 710 (D.C.E.D.N.Y. 1979); (the burden of going forward with proof of solvency is on the transferee, whereas under federal law, the procedure is otherwise); *In re Russo*, 1 B.R. 369, 379 (Bkrtcy.E.D.N.Y.1979), *aff'd*, Sept. 11, 1980 (D.C.E.D.N.Y., Nickerson, D.J.) ("a conveyance made by a grantor, without consideration, at a time when he is indebted to various creditors raised a presumption of insolvency").

In *GaNun v. Palmer, supra*, Judge Cardozo articulated this same principle, stating:

> [A] transfer without consideration by one who is then a debtor raised a presumption of fraud. The creditor may stand upon that presumption until it is repelled. It is not for him to show what other property was retained.

216 N.Y. at 611, 111 N.E. 223. *See also In re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585, 622–23 (Bkrtcy.E.D.N.Y.1981), *aff'd*, 21 B.R. 402 (D.C.E.D.N.Y.1982).

■ Accordingly, the New York Debtor and Creditor Law evinces a policy protective of creditors in placing the burden of going forward with proof of the debtor's solvency on the transferee. The New York legislature is presumably more interested in protecting New York creditors than creditors who reside in other states. Because OPM and a substantial number of its creditors are New York based, the State of New York does indeed have a great interest in having its law applied in the instant case.

**394**

## 2. *Oregon Substantive Law*

By shifting the burden of proof to the transferee to show that no fraud took place when badges of fraud are present, Oregon law generally favors the position asserted by creditors. The Oregon legislature presumably is not as interested in protecting all creditors as it is in protecting Oregon corporations and Oregon creditors. It thus is fair to infer that the State of Oregon has less interest in having its law apply to the instant case than does the State of New York because OPM is a New York corporation which did a great deal of its business out of New York and has a much greater number of New York creditors than Oregon creditors.[9]

Defendants assert that the law of Oregon and not that of New York should govern the alleged fraudulent conveyances since Oregon has the "most significant contacts" with the transactions. Defendants enumerate as contacts with Oregon: a) negotiations for the early termination of ES–3 took place in Oregon; b) execution of the agreement took place in Oregon; c) negotiation and execution of security agreements and "sublease" between OPM and Far West took place in Oregon.

However, this approach has not been uniformly accepted by New York courts as the method to decide tort issues in a choice of law context. As noted earlier, the New York Court of Appeals applies both center of gravity and interest analysis to determine which state's substantive law to ap-

ply. Consequently, this court will, for the reasons stated above, engage in interest analysis once again.

Similarly to New York's provisions, Oregon's statute [10] voids any conveyance made with intent to hinder, delay, or defraud creditors. Furthermore, this statute specifically makes the question of fraudulent intent one of fact and not of law.[11] The body of case law interpreting these provisions of the Oregon statute is scant. However, in *Orsen v. Siegle*, 170 Or. 153, 132 P.2d 409 (1942), a case interpreting the predecessor of Oregon's fraudulent conveyance statute, the Supreme Court of Oregon declared:

> [W]hile the burden of proof to establish fraud is on the party who has the affirmative of the issue, yet where there are 'accompanying circumstances, tending to excite distrust and suspicion as to the bona fides of the deed,' . . . the burden of explaining the transaction will be shifted to the transferee.

*Id.* at 163, 132 P.2d at 413. (citation omitted). *See also Evans v. Trude*, 193 Or. 648, 240 P.2d 940, 944 (1952).

Thus, if Oregon law were to apply, the Trustee would be required to establish that transfers were made by OPM with intent to defraud its creditors, and Far West would then have to explain the transfers and show that they did not defraud OPM's other creditors. Furthermore,

---

**9.** An examination of the docket of proofs of claim filed in the OPM bankruptcy case reveals that out of a total of 672 claims, 206 were filed by New York creditors while only two were filed by Oregon creditors. In addition, out of a total of approximately $369 million in claims filed, the 206 claims filed by New York creditors aggregate approximately $160.6 million, while the two claims filed by Oregon creditors aggregate approximately $1.2 million. Thus, almost half of the dollar value of all claims filed in this estate has been filed by New York creditors.

**10.** Oregon Revised Statutes (O.R.S.) § 95.070 (1953) provides:
*Conveyance, transfer or device to defraud, hinder or delay creditors.*
Every conveyance or assignment in writing or otherwise of any estate or interest in lands,

goods or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered with the like intent as against the person so hindered, delayed or defrauded is void.

**11.** O.R.S. § 95.090 (1953) provides:
*Fraudulent intent as question of fact.*
The question of fraudulent intent in all cases arising under the provisions of this chapter is one of fact and not of law.

[w]hen ... a transfer by a debtor in preference of creditors ... is made under circumstances which are such as to involve so-called 'badges of fraud,' the burden is then on the transferee to demonstrate that the transfer was not fraudulent by proof that it was not made with an intent to defraud other creditors; that the consideration was fair and adequate; and that no benefit was secured or reserved to the grantor.

*Nelson v. Hansen,* 278 Or. 571, 578, 565 P.2d 727, 731 (1977). The badges of fraud which will shift the burden to the transferee include the insolvency of the transferor debtor at the time of transfer, that the transfer was for less than fair consideration, and that the transferor reserved a benefit for itself. 278 Or. at 578–79 n. 2; 565 P.2d at 731–32 n. 2.

■ Accordingly, Oregon law evidences a concern for the protection of its creditors in shifting the burden to the transferee to show that no fraud occurred when badges of fraud are present. The interest analysis of the choice of law issue thus yields a false conflict, in that the application of Oregon's laws to the parties and issues involved would not further the policies behind those laws, while the application of the laws of New York would promote the policies behind the law of New York. Oregon law seeks to protect Oregon creditors. On the other hand, New York law seeks either to protect New York creditors, or creditors of New York corporations. *See Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382, 300 N.Y. S.2d 817, 823, 248 N.E.2d 576, 582 (1969), where the New York Court of Appeals applied the New York Statute of Frauds, reasoning that the policy behind the adoption of the New York Statute of Frauds is to afford both out-of-state and in-state creditors a great degree of protection against unfounded claims by brokers and finders. Such protection, in turn, encourages the use of New York brokers and finders and contributes to the economic development of New York.

As detailed in footnote 9 *infra,* this Court's docket of proofs of claim filed in the OPM bankruptcy case indicates that a vast number of OPM's creditors are New York based. Certainly, OPM has far more New York creditors than Oregon creditors. Also, OPM is a corporation incorporated in New York which did a major portion of its business out of New York. Thus, New York has a closer connection to the facts of this case and a greater interest in having its law which polices the activities of its insolvent corporations and which remedies wrongs to creditors of New York corporations principally perpetrated by a New York resident applied. *See, e.g., In re Lea Fabrics,* 226 F.Supp. 232, 236 (D.N.J.1964), where, in applying the law of the state where the debtor did substantial business, the court reasoned that his creditors "would undoubtedly and reasonably assume that they would be subject to and protected by the laws of the State of New Jersey, and no other state." *See also In re OPM Leasing Services, Inc.,* 28 B.R. 740, 752 (Bkrtcy.S.D.N.Y.1983).

Where there is a false conflict, the law of the jurisdiction truly interested in applying its laws should govern. *See generally* B. Currie, *Married Women's Contracts: A Study in Conflict of Laws Method,* 25 U. of Chi.L.Rev. 227 (1958). New York law will therefore be applied in determining whether the Trustee may recover the transfers in question pursuant to Code § 544(b).

B. *Application of New York Law to the Conveyances at Issue*

■ In short, OPM was not liable to Euramlease on its nonrecourse Note, and had no legal obligation to pay it, either by (a) reimbursement to Far West; (b) sublease payments to Far West; or (c) payments to the Trust Account. All of the payments OPM made were thus unsupported by any consideration and unjustifiably depleted OPM's estate in preference of Far West and to the substantial detriment of OPM's other creditors. Thus, under Code Section 544(b) coupled with New

York DCL § 270 *et seq* the Trustee may avoid these transfers.

■ In addition, pursuant to Code Section 548(a)(2), independent of considerations as to New York law, the Trustee may likewise avoid all of these transfers effected within one year of the filing date. *See Rubin v. Manufacturers Hanover Trust,* 661 F.2d 979, 991–96 (2d Cir.1981) (construing a predecessor to § 548, § 67d of the former Act). In *Rubin,* the Second Circuit declared that in determining what constitutes "fair consideration," "the Court, must attempt to measure the economic benefit, if any, that accrued to each bankrupt ... [and] then determine whether that benefit was 'disproportionately small' when compared to the size of the security that that bankrupt gave and the obligations that it incurred." *Id.* at 993. The Second Circuit then continued: "[A]ny significant disparity between the value received [by the debtor] and the obligation assumed ... will have significantly harmed the innocent creditors of [the debtor]" *Id.* at 994. And, the Court also declared that fair consideration may be present where the debtor is only benefitted indirectly, as where payments are made to a third party, so long as "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up." *Id.* at 992. Here, it is clear that OPM derived no economic benefit from the transfers it made proportionate to the value it transferred and thus they may be avoided by the Trustee.

1. *Payments Made by OPM to Euramlease Prior to April 1980*

As described *supra,* OPM's nonrecourse Note payable to Euramlease was secured by OPM's assignment to Euramlease of all ES–3 rents it was to receive from Far West. Euramlease accepted OPM's assignment and agreed to apply the payments to OPM's Note obligation. After Far West surrendered the equipment and OPM subsequently re-leased part of it to Hartz, Far West did not pay Euramlease the ES–3 rents between December 1979 and April 1980. Instead, OPM made five payments of $29,110.00 each directly to Euramlease.

Nothing that Far West did provided fair consideration or equivalent value for OPM's assumption of Far West's rental obligations. First, pursuant to the hell or high water clause in ES–3, Far West could not escape its obligation to make all rental payments to Euramlease regardless of whether Far West retained possession of the equipment or not. *See In re OPM (Hassett v. State of West Virginia),* 21 B.R. 993, 1005–07 (Bkrtcy.S.D.N.Y.1982). Thus, Far West's surrender of the equipment to OPM neither constituted fair consideration for OPM's assumption of Far West's rent obligation nor relieved Far West of its obligation to pay rent, even though Far West no longer enjoyed the use of the equipment.

■ Second, Far West's assertion that its exercise of the upgrade provision and subsequently the "sublease" under ES–3 provided fair consideration for OPM's assumption of Far West's ES–3 rental obligations is incorrect. As discussed *supra,* both Far West and OPM totally failed to comply with the notice requirements of ES–3. In addition, due to Far West's failure to notify Euramlease of this upgrade, Far West failed to pay Euramlease the Notice Amount and additional rent as required upon its exercise of these options. OPM received no new consideration or value by virtue of Far West's purported exercise of the Early Special Sublease Option because it was part of ES–3, an agreement under which OPM had a preexisting obligation to perform. Once Far West elected in favor of either or both of the Upgrade Option and the Early Special Sublease Option, OPM was legally required to act. It is settled law that "neither the promise to do a thing, nor the actual doing of it, will be a good consideration if it is a thing which the party is bound to do ... by a subsisting contract with the other party." *Vanderbilt v. Schreyer,* 91 N.Y. 392, 401 (1883). *See generally* 1A *Corbin on Contracts* §§ 171–92; 1 *Williston on Contracts* §§ 120–33 (3d ed. 1957).

Third, OPM's gratuitous assumption of Far West's ES–3 rent obligations impermissibly modified the terms of ES–3. This is because after OPM assigned all of its ES–3 rights to Euramlease, it lost its ability to modify the terms of ES–3. Fourth, the letter, dated February 11, 1980 written by Mel Durao to Ed Sweeting of Far West, wherein OPM purported to terminate all of Far West's ES–3 obligations and assume the Note payments to Euramlease, was also unsupported by consideration. Thus, Far West's attempt to term this letter an inducement to enter into the Early Special Sublease to OPM of the ES–3 equipment and an exercise of Far West's early termination option under ES–3 cannot succeed. Accordingly, the five rental payments made by OPM directly to Euramlease of $29,-110.00 prior to April 1980 may be avoided pursuant to Code Section 544(b) and the New York DCL.

2. *The April 1980 Agreements Reassuring Euramlease and Arranging Reimbursement in Advance by OPM to Far West for the May through July 1980 ES–3 Rental Payments*

William P. Umbs, a former Euramlease vice-president [12], testified that Euramlease did not discover until early 1980 that OPM had been making Far West's ES–3 rental payments and that the equipment had been removed from Far West's premises. In response to Euramlease's threatened acceleration of the ES–3 payments due to Far West's default, two letter agreements were executed.

As described *supra*, these agreements were wholly gratuitous and unsupported by consideration. Thus, they are not binding on the OPM Trustee and he may avoid all transfers made pursuant to their terms under the authority of Code § 544(b) and the New York DCL. The first letter agreement dated April 24, 1980, "the Euramlease agreement," contained Far West's acknowledgement of its default and agreement to pay Euramlease the ES–3 rents directly.

Euramlease, in return, agreed not to exercise its remedies under ES–3.

The second letter agreement, the April 1980 agreement, superseded the Durao letter. The Durao letter contains OPM's first agreement to repay its Note held by Euramlease by April 1980. In the April 1980 agreement, OPM promised to reimburse Far West in advance for ES–3 rental payments from May through July 1980 and to pay off the Note by August 1980. Far West also acknowledged the lease of the equipment to Hartz.

In the Joint Pretrial Order, the parties stipulated that pursuant to the April 1980 agreement, OPM paid Far West $261,-990.00. This sum apparently includes reimbursement for the rental payments of $29,-110.00 each for May through July 1980, totalling $87,330.00. The remaining $174,-660.00 apparently represents payments made by OPM under the sham sublease which was created pursuant to the August 1980 agreement and which will be dealt with *infra*.

3. *The August 1980 Agreement Which Created the Sham Sublease and the Trust Account*

As described *supra*, the April 1980 agreement was later amended by the August Agreement between OPM and Far West. This agreement created the Account which is the cornerstone of this litigation and which will be dealt with separately *infra*. In addition, pursuant to this agreement, OPM "subleased" the ES–3 equipment from Far West, although not via the required device of the Early Special Sublease Option specified in ES–3. Because of OPM's and Far West's disregard of formal business practices, the Early Special Sublease Option under § 5(b) of ES–3 never was executed. Furthermore, the ES–3 equipment had been removed from Far West's premises and control in November 1979, making it difficult to understand how Far West could claim that this long gone equipment was the consideration for the "sublease".

---

**12.** William P. Umbs' deposition testimony was admitted at trial as evidence in chief.

The Trustee in his fourth claim seeks to recover three payments made within ninety days of the filing of OPM's petition as preferential transfers under Code § 547(b) out of the total paid under this "sublease" between August 1980 and February 1982 of $174,660.00. To reiterate, Code § 547(b) permits the Trustee to recover transfers made by the debtor within 90 days of the filing of its petition at a time when it was insolvent which otherwise would enable certain of its creditors to receive more than they would have received in a chapter 7 liquidation.

However, the Trustee has failed to discharge his burden of proof under § 547(b) that the three payments made within the 90 day period were preferences. There was no antecedent debt owed by OPM to Far West because the August 1980 "sublease" was a sham. Because this agreement was a sham, it follows that a valid debtor/creditor relationship could not have arisen therefrom. The Trustee may nonetheless recover the entire $174,660.00, paid pursuant to the "sublease" over the six-month period via the rubric of Code § 544(b), because of the same factors enabling him to recover the other payments already discussed. Thus, his failure to satisfy the elements of a preference is of no consequence.

## C. *The Trust Account*

Pursuant to the Joint Pretrial Order, the parties have stipulated that OPM deposited a total of $574,660.00 into the Trust Account at Far West and that on the filing date the Trust Account balance aggregated $591,306.87. The Trustee as a hypothetical lien creditor seeks to recover this aggre-

gate amount under Code § 544(a), a provision known as the "strong-arm" clause[13]. The Trustee's third claim tracks the language of that provision, asserting that his interest in the Account is superior to that of Far West and Bauer, which entities had no lien or security interest in the Account when OPM's petition was filed. Because this Court finds that these transfers into the Account may be avoided pursuant to Code § 544(b) and its directive to apply state law regarding fraudulent conveyances, there is no need to resort to the extraordinary powers granted to the trustee by the Code § 544(a). *See* 4 *Collier* ¶ 544.01 at 544–2.

Having decided that Code § 544(b) governs the disposition of these transfers, a threshold issue for determination is whether the law of Oregon or the law of New York is "applicable law" under this Code section. The law which reigns will then be applied in determining the substantive issue of whether the trust corpus should be turned over to the Trustee.

## 1. *Whether Oregon or New York Law Should Apply*

The Trustee's argument that the substantive provisions of New York law should apply is incorrect. As reviewed previously, this Court will apply New York's choice of law rule in determining whether Oregon or New York substantive law should apply. *See Klaxon v. Stentor Electric Manufacturing, Inc., supra,* holding that the proper choice of law rule is the one of the jurisdiction in which the court is sitting.

---

**13.** Code § 544(a) provides:
(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; and
(3) a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.
11 U.S.C. § 544(a) (1983).

New York's choice of law rule pertaining specifically to the validity and construction of a nontestamentary trust of personal property has long been to apply the law of the situs of the trust without undertaking an interest analysis. *See Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 845–46 (E.D.N.Y. 1981) *aff'd.*, 678 F.2d 1150 (2d Cir.1982) ("New York's choice of law dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer."); *Erdheim v. Mabee*, 305 N.Y. 307, 316–17, 113 N.E.2d 433, 437 (1953) (trust property subject to laws of jurisdiction where situated (citing *Hutchinson* )); *Hutchinson v. Ross*, 262 N.Y. 381, 395, 187 N.E. 65, 71 (1933) (validity of trust determined by law of state where property located). *See also Underwood v. Phillips Petroleum Co.*, 155 F.2d 372, 374 (10th Cir. 1946) ("a state has jurisdiction over personal property within its territorial limits...."); *Commissioner of Internal Revenue v. Brown*, 122 F.2d 800, 802 (3d Cir. 1941) (law of situs of trust controls).

In addition, the August 1980 agreement creating the Account provided that it would be located in Oregon and administered by Bauer in Oregon. The Account *res* was delivered to Far West in Oregon. Thus, even if New York choice of law rules did not designate the law of the situs as controlling, and either a center of gravity test or interest analysis were applied, the result should be the same. *See* 5 *Scott* § 599(1) at 3919–20. Thus, applying New York's choice of law rules for trust cases, this Court should apply Oregon law.

b. *Application of Oregon Substantive Law to the Trust Issue*

Pursuant to the substantive provisions of Oregon law, in the instant case, a valid trust was created whose *res* must be returned to its settlors' successor in inter-est, the OPM Trustee. This is because Euramlease, the intended beneficiary of the Account, may properly be deemed to have waived all of its interest in the Account. And, even in the absence of a disclaimer, it is established under Oregon law that upon the failure of an express trust,[14] it springs back or results in favor of the person who made the disposition, here, OPM. *See Belton & Buesing*, 240 Or. 399, 402 P.2d 98, 107 (1965) (concurring opinion).

Under Oregon law, "the grantor's intent at the time of making the conveyance determines the nature of the interest created...." *Belton v. Buesing*, 240 Or. 399, 402 P.2d 98, 103 (1965). In the August 1980 agreement, OPM's express intention was to create a Trust Account with Euramlease as the beneficiary. "The intent to create a trust relationship ... is the key element in determining the existence of an express trust." *In re Thornton*, 544 F.2d 1005, 1007 (9th Cir.1976). Although no Oregon cases addressing the other elements necessary for the creation of a valid trust have been found, two other generally accepted elements are that the trust property must be transferred to the trustee, and that the trustee must segregate the trust property from all other properties. *See* I *Scott* § 32; II *Scott* § 179 (3d ed. 1967).

Here, OPM transferred $329,-110.00 pursuant to the August 1980 agreement to the trustee. Far West or Bauer (it is unclear who) then deposited the funds into this segregated Account. Far West then transferred $100,000.00 which had previously been deposited by OPM with Far West to the Account. These deposits thus satisfy the latter two requisite elements for a valid trust under Oregon law described above and an intent to create a trust may also be inferred from these actions.

It must next be determined whether Euramlease's decision not to look to the Account for repayment of the Note suffic-

---

**14.** According to the record in this case, Euramlease has apparently been paid in full by Far West, but not by payment via the Trust Account. *See* Trustee's Trial Memorandum at 40. Thus, the purpose of this express trust has failed.

es to operate as a disclaimer of its intended beneficial interest in the Account under Oregon law. Oregon has adopted the Uniform Disclaimer of Transfers under Nontestamentary Instruments Act. *See* Oregon Revised Status ("O.R.S."). Its operative section is § 105.627, which defines who may disclaim and the form a valid disclaimer must take.[15] Section 174.100 in Chapter 174 O.R.S., *Construction of Statutes & General Definitions*, defines "person" to include corporations, firms and partnerships, as well as individuals,[16] thus bringing Euramlease within its purview. In addition, O.R.S. § 105.630 provides that the disclaimer is valid if made within nine months of the effective date of the instrument which created the interest or within nine months after the person entitled to disclaim gains actual knowledge of the existence of the interest. O.R.S. Section 105.-630 also requires that notice of the disclaimer be "mailed by registered or certified mail to the trustee or other person having legal title to, or possession of, the property or interest disclaimed or who is entitled thereto in the event of disclaimer." *Id.* Again, upon referring to the definitional and construction section of O.R.S., § 174.160, it is clear from the face of the statute that the purpose of the mailing requirement is to give notice of the beneficiary's disclaimer.[17]

■ The entity asserting the disclaimer, here, OPM, has the burden of showing that the disclaimer was clear and unequivocal, by some positive or affirmative act or statement on the part of the beneficiary.

**15.** O.R.S. § 105.627 provides in relevant part: *Disclaimer of interest in property transferred by nontestamentary instrument; duration of right for disclaim; form of disclaimer.* A person ... who is a ... beneficiary under a nontestamentary instrument or contract ... may disclaim in whole or in part the right of transfer to that person of any property or interest therein by delivering a written disclaimer under O.R.S. 105.625 to 105.640.... The disclaimer shall discribe the property or interest therein disclaimed, declare the disclaimer and extent thereof, and be signed by the disclaimant.

**16.** O.R.S. § 174.100 (1981) provides:

*See In re Pellicer's Estate,* 118 So.2d 59 (Fla.App.1960); *In re Carpenter,* 36 Misc.2d 346, 232 N.Y.S.2d 892 (Surr.Ct.N.Y.Co.1962). *See also* 1 Scott on Trusts § 36.1 and n. 2 (3d ed. 1967).

This Court finds that Euramlease's letters to Far West dated January 25, 1981 and April 29, 1981, in which Euramlease stated its intention to look to Far West and the collateral and not to the Account for repayment of the Notes constitute sufficient notice of disclaimer to the person in possession of the Account, especially in light of the apparent unity of interest between Far West and Bauer. On January 25, 1981, Far West wrote to Euramlease, stating:

I have your letter of January 23, concerning the above referenced subject. As you know, OPM removed from your premises certain equipment subject to our first lien under the lease which was, and continues to be, a direct obligation and responsibility of Far West Federal Savings. The fact that you have accumulated approximately $550,000 in a "Trust Account for Your Benefit" is a reflection of your arrangements with OPM following the unauthorized removal from your premises of the equipment in question. Whether or not you encounter increasing difficulty in collecting from OPM is a matter between OPM and yourselves.

And, on April 9, 1981, Euramlease reiterated its intention not to look to the Trust Fund, declaring:

*Definitions.* As used in the statute laws of this state, unless the context or a specially applicable definition requires otherwise:
(3) "Person" includes individuals, corporations, associations, firms, partnerships and joint stock companies.

**17.** O.R.S. § 174.160 (1969) provides:

*Mailing methods authorized in place of notice by registered or certified mail.* Whenever, *for the purpose of giving notice,* registered or certified mail, with or without return receipt, is authorized or required by or pursuant to statute, it is sufficient to use in lieu thereof any mailing method that provides for a return receipt.

Far West is primarily and directly obligated to us for the timely payment of all rentals and other monies due and to become due under the Equipment Schedule notwithstanding any right or claim Far West may or may not have in respect to the Trust Fund referred to in your letter of March 20, 1981.

Although Mr. Umbs in his deposition stated that Euramlease did not intend by those letters to reject or disclaim its interest in the Account, the effect of the letters admitted into evidence was to reject Euramlease's interest as a beneficiary. And, Euramlease's subsequent refusals to take action against Far West relating to payments into the Account similarly aggregate to constitute such a waiver. It is abundantly clear that Euramlease had no intention of risking its clearcut enforcement rights against Far West by allowing this questionable account to substitute for those rights.

According to O.R.S. § 105.632, "unless the nontestamentary instrument ... provides [otherwise,] the ... interest therein disclaimed devolves ... as to a present interest, as if the disclaimant had died before the effective date of the instrument." *Id.* In addition, the statute provides that the disclaimer relates back to the effective date of the instrument which created the disclaimed interest. *Id.* In the Comment to the Uniform Act, reference is made to the Comment, which accompanies the Uniform Disclaimer of Transfers By Will, Intestacy Or Appointment Act. That Comment declares that "[i]t has been generally thought that devolution in the case of disclaimer should be the same as in the case of lapse...." *Id.*

Similarly, in *Stoehr v. Miller*, 296 F. 414 (2d Cir.1923), the Second Circuit declared:

Any equitable rights arising from a declaration of trust are at an end after the renunciation and the settlor holds title to the res free and clear of the trust.... If [the beneficiary trust] repudiates it when he learns of it, his repudiation relates back [to the date of the declaration]

and the title must be regarded as having been in the settlor all of the time. *Id.* at 425.

■ Thus, under Oregon law, upon Euramlease's disclaimer, its interest in the Account reverted to OPM, the settlor. Since the Trustee has legal title to all of OPM's estate, *see* Code § 541, he may recover the Account. *See Scott* § 10 at 87. Like the payments discussed *supra*, there was no consideration for OPM's assumption of the obligation to pay the nonrecourse Note or for making payments to the Trust Account and they may be avoided under Code § 544, which enables this Court to apply the above-detailed Oregon law regarding trusts and fraudulent conveyances. Put another way, the funds in the Account remained the property of OPM.

■ Moreover, even were a valid disclaimer to be found wanting under Oregon law, the trust *res* should revert to its settlor and secondary beneficiary, OPM. There is no doubt that this trust, of which OPM was expressly made secondary beneficiary in the trust instrument, failed of its only purpose and thus it springs back or results in favor of OPM. *See Belton v. Buesing*, 240 Or. 399, 402 P.2d 98, 107 (concurring opinion); I Scott on Trusts ¶ 9 at 83, ¶ 10 at 87. (3d ed. 1967). The purpose for which this trust was created can be seen to have been fully accomplished without exhausting the trust property. This is because the funds in the Trust Account were never paid to Euramlease, which refused to receive them. Instead, Bauer breached his fiduciary duty in unjustifiably appropriating the trust funds to his client, Far West, which had no legal or beneficial right to them. Moreover, the Trust Account bore OPM's social security number and OPM paid all income taxes on its contents.

### D. *The Post-Petition Transfers*

■ In the Joint Pretrial Order, the parties stipulated that Bauer withdrew funds from the Trust Account on dates subsequent to the date the petition was filed. It can also be inferred from the

Pretrial Order that Bauer made two of these withdrawals three months and six months respectively after October 15, 1981, the date this adversary proceeding was filed. Also, the record indicates that although Far West indicated its awareness of the Chapter 11 filing, by filing its proof of claim in the OPM case on April 6, 1981, Bauer nevertheless made withdrawals from the Account thereafter on September 8, 1981, January 4, 1982 and April 15, 1982.

The parties have further stipulated in the Joint Pretrial Order that the Account balance aggregated $591,306.87 including accrued interest on the date OPM filed its petition. When Bauer and Far West transferred the Account balance to an Equitable Savings and Loan certificate of deposit on March 11, 1981, the same day that OPM filed its petition for relief, they improperly appropriated estate property. The OPM bankruptcy filing on March 11, 1981 was an open and notorious media event reported significantly earlier in the day under the west coast time zone. Although unlikely, even if the March 11, 1981 transfer to a Certificate of Deposit was accomplished minutes or hours prior to the actual filing in New York, the result would be the same because the subsequent dealings with the transferred funds detailed above are clearly vulnerable to denunciation under § 549.[18]

Code § 549 empowers the Trustee to avoid these kinds of post-petition transfers of property of the estate made without the authorization of the Court or the Code if the action is commenced within two years after the date of the transfer sought to be avoided. 4 Collier ¶ 549.02 at 549–5 through 549–7 (15th ed. 1983). Thus, the Trustee may avoid all of these transfers made without court consent pursuant to Code Section 549.

The three further transfers made between September 8, 1981 and April 15, 1982

to Far West aggregated $465,760.00. Apparently, Far West believed itself justified in resorting to self-help even in the face of the filing in seeking to reimburse itself for payments it had previously made to Euramlease. However, as has been detailed, such payments were merely gratuitous as neither OPM nor Euramlease was under any legal enforceable compulsion to reimburse Far West.

In addition, Far West and Bauer's postpetition appropriations violated the automatic stay embodied within Code § 362. The automatic stay is effective from the time that the petition for relief is filed until the property it is intended to protect "is no longer property of the estate." Code § 362(c)(1); 2 Collier ¶ 362.06, supra at 362–43.

Moreover, Far West may have thought itself entitled to set off mutual debts and credits when it made various postpetition transfers to itself from the account. However, as this Court noted in In re OPM Leasing Services, Inc. (Hassett v. Herbert Weissman and Fundways, Ltd., 35 B.R. 854 (Bkrtcy.S.D.N.Y.1983):

> It is well established that a party will be unable to assert a setoff where that party is being sued for fraudulent transfers. See, e.g., Bennett v. Rodman & English, Inc., 2 F.Supp. 355, 358 (E.D.N.Y.1932); Irving Trust Co. v. Frimitt, 1 F.Supp. 16 (S.D.N.Y.1932). This is because where the party seeking to set off is being sued for fraudulent transfer, there is no mutuality of obligations, which is required under Code Section 553(a). See 4 Collier ¶ 553.04[2]; see also In re J.A.G., Inc., 7 B.R. 624 (Bkrtcy.D.Mass.1980).

Id. at 868 (footnote and citations omitted). If Far West was trying to assert a valid setoff, Far West and Bauer should have moved this Court pursuant to Code § 362(d) [19] for a modification of the auto-

---

18. See note 5 infra.

19. Code Section 362(d) provides:
 (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of

this section, such as by terminating, annulling, modifying, or conditioning such stay—
 (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

matic stay, rather than employing self-help techniques in violation of that stay.

■ A party may violate the stay even if it does not know of its existence. As the Collier treatise states in summarizing practices under Code Section 362: "[A]ctions taken in violation of the stay will be void even where there was no actual notice of the existence of the stay. If the violation is willful there are ample powers to punish for contempt...." 2 *Collier* ¶ 362.03 at 362–27 (15th ed. 1983). *See also Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540, *reh. denied*, 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977).

■ Although the method used by Far West to recover amounts which it believed were owed it was ill-advised and contrary to the spirit as well as the letter of Code § 362, to hold Far West and Bauer in contempt under 28 U.S.C. § 1481 would be inappropriate because the Trustee has submitted no clear and convincing proof of Bauer's deliberate flouting of the provisions of the stay. This lack of a showing of willful misbehavior militates in favor of this Court's declining to punish for civil contempt in this instance. *See In re Reed*, 11 B.R. 258, 268–76 (Bkrtcy.D.Utah 1981), where in finding a contempt based on a showing of "special facts ... showing not only a knowledge of the bankruptcy but also its implications in terms of protection for the debtor", *id.* at 275, Bankruptcy Judge Mabey declared that although the disobedience of a court order need not be willful to constitute civil contempt, courts generally insist that parties have notice of the stay which is sufficiently definite and precise so as to have put then on notice of the conduct proscribed. Judge Mabey also stated that this receipt of notice of the order as well as all other elements of civil contempt must be shown by clear and convincing evidence.

■ Moreover, the principal aims of civil contempt are to coerce the defendant into compliance with a court's order or to compensate the complainant for losses, or both. *See United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1946); *In re Stacy*, 21 B.R. 49, 6 C.B.C.2d 1031, 1034 (Bkrtcy.W.D.Va. 1982). These aims would in no way be furthered here because Bauer has ceased transacting postpetition and the funds he previously dealt with are, as a result of this opinion and order, to be returned to the Trustee. As one court stated: "The drastic nature of contempt ... dictates that it should be used only in 'clear and urgent instances' of effrontery to the power of the court." *In re Stacy*, 21 B.R. at 53, 6 C.B.C.2d at 1035 (*quoting Springfield Bank v. Caserta*, 10 B.R. 57, 59 (Bkrtcy.S. D.Ohio 1981)). Nonetheless, Mr. Bauer, as an officer of the court and a fiduciary, has a higher duty to apprise himself of the Code's requirements, particularly those contained in Code Section 362, and is hereby admonished against similar behavior in the future. As the Second Circuit has cautioned, any question as to whether or not the stay applies should be addressed by means of a motion to lift the stay under Code Section 362(d). *See Fidelity Mortgage Investors, supra.* Bauer's imprudent acts escape contempt retribution this day more for the moderate case that was made than for any other reason.

## VI. *Conclusion*

For the reasons detailed above, the Trustee may recover the following payments:

1. $145,550.00 paid by OPM to Euramlease between December 1979 and April 1980;

2. $87,660.00 paid by OPM to Far West between May and July 1980;

---

(2) with respect to a stay of an act against property, if—
 (A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.
11 U.S.C. § 362(d) (1983).

3. $591,306.87 representing the balance in the Trust Account on the date OPM filed its petition;

4. $174,660.00 paid by OPM to Far West between August 1980 and February 1981 pursuant to the sham sublease;

5. All postpetition transfers made by Bauer and Far West from the Account to reimburse Far West to the extent those monies are not recovered as part of the Trust Account balance.

The Trustee cannot recover the payment of $10,467.38 to Cole & Deitz, a law firm which allegedly acted as counsel to Far West or Euramlease, because he has submitted no convincing evidence justifying such an avoidance. He has not made out a case regarding this payment in offering neither a factual explanation for this payment nor a legal theory which would justify its recovery.

Moreover, Far West and Bauer cannot succeed on the counterclaim wherein they seek the reasonable rental value of the ES–3 equipment since February 1981. This is because, for the reasons detailed *infra,* this Court concludes that the sublease under which these defendants claim these rentals was a sham.

Each party shall bear its own costs and attorneys fees and no punitive damages shall be awarded.

The foregoing shall constitute this Court's findings of fact and conclusions of law pursuant to FRCP Rule 52 as applicable in bankruptcy adversary proceedings pursuant to Bankruptcy Rule 7052.

It is SO ORDERED.